**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTOR BALTIMORE,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 1031 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| **OBECKYO QUINN-MIMS,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Victor Baltimore brought suit alleging various claims against, among others, Obeckyo Quinn-Mims, regarding a child abuse investigation she performed. He alleges three claims against Quinn-Mims including deprivation of his Fourth, Fifth and Fourteenth Amendment rights under 42 U.S.C. § 1983 (Count I); conspiracy under 42 U.S.C §§ 1983 and 1985 (Count II); and a state law claim for false light (Count IV).[1] Quinn-Mims has moved for summary judgment with respect to all claims against her and Baltimore moves to voluntarily dismiss the conspiracy claim. Baltimore's motion to voluntarily dismiss Count II is granted and, for the reasons stated below, Quinn-Mims' motion for summary judgment as to Counts I and IV is granted.

**I.     Facts**

*Background*

The Court has jurisdiction over Baltimore's claims under 28 U.S.C. §§ 1331, 1343(a), and 1367, and venue is proper in the Northern District of Illinois because a substantial portion of

---

[1] Count III, a failure to supervise claim, is not alleged against Quinn-Mims.

the events giving rise to Baltimore's claims took place in this district. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 4.)

The parties agree on many of the following facts. Any dispute with proper support in the record is noted. All times are approximations. In March 2009, Baltimore had three biological children, whom the Court will identify as K1, K2, and K3. (*Id.* ¶ 5.) Baltimore currently resides in Zion, Illinois, with his second wife, Princess Singleton and her son, whom the Court will identify as E. (*Id.*) At the time the events at issue took place, K1, K2, and K3 lived with Baltimore during the school year and with their biological mother, Kari Ann Young, during the summers and on holidays. (*Id.* ¶¶ 5, 7.)

Roberta Vanorsby is a case manager for Aunt Martha's Youth Service Center Teen Parenting Program and has been an employee of Aunt Martha's since 1998. (*Id.* ¶ 8.) She was assigned to be the case manager for Princess Singleton, a ward of the Illinois Department of Children and Family Services ("DCFS"), from August 2006 through June 2009. (*Id.*) As a case manager for Aunt Martha's, Vanorsby is a mandated reporter of child abuse pursuant to the Abused Neglected Child Reporting Act, 325 Ill. Comp. Stat. 5/1 *et seq*. (*Id.*)

Quinn-Mims has been employed by DCFS as a child protection services worker since 2008. (*Id.* ¶ 2.) Her duties include investigating reports of physical and sexual abuse and neglect of children. (*Id.* ¶ 9.) She assesses risk factors of involved children, takes necessary action to ensure protection of children and makes recommendations about investigative findings. (*Id.*)

Pamela Foster-Stith is a Child Protection Supervisor for DCFS in its Waukegan Office and has been an employee of the Department since 1993. (*Id.* ¶ 10.) She was Quinn-Mims' direct supervisor at the time of the events at issue. (*Id.*) She also conducted various parts of the

2

March 4, 2009, investigation of Baltimore. (*Id.*)

David Durpetti is a Manager for DCFS and has been a DCFS employee since 1995. (*Id.* ¶ 11.) He was the manager overseeing the Baltimore child abuse investigation in March 2009. (*Id.*)

*Baltimore's History*

In November 1991 and February 1992, Baltimore was investigated and indicated[2] by DCFS for child sexual abuse. (*Id.* ¶¶ 14-15.) In criminal court proceedings, he was found not guilty of the charge of criminal sexual assault. (*Id.* ¶ 17.) DCFS's retention period for indicated findings of sexual abuse for sexual penetration is fifty years. (*Id.* ¶ 18.) Baltimore did not appeal the DCFS indicated findings regarding the 1991 and 1992 incidents and they remain on the State Central Register. (*Id.* ¶ 19.)

*March 2009 Investigation of Baltimore*

In January 2009, Vanorsby did a background check on Baltimore because he was living with Singleton, a DCFS ward. (*Id.* ¶ 20.) The check disclosed Baltimore's prior DCFS indicated findings of sexual abuse from 1991 and 1992. (*Id.*) On March 4, 2009, Vanorsby reported to the DCFS hotline that Singleton and her son were living with Baltimore, an indicated sex offender. (*Id.* ¶ 21.) The hotline transmitted Vanorsby's report to the DCFS Waukegan field office as an "action needed" case, requiring DCFS to take prompt action, investigate, and proceed immediately to locate the child or children who are the subject victims of the hotline report. (*Id.* ¶ 22.) The action needed directive from the hotline report stated: "Please check on the welfare

---

[2] "'[I]ndicated' is a DCFS term meaning that an investigation has shown the person committed the alleged act." *In re M.M.*, 928 N.E.2d 1281, 1282 n.2 (Ill. App. Ct. 2010).

and safety of the child . . . [because] a sex offender has access." (*Id.*) The report further specified that Singleton, a DCFS ward, and her son were living with Baltimore, an indicated sex offender. (*Id.*)

On March 4, 2009, Foster-Stith assigned the investigation to Quinn-Mims and directed her to visit Singleton's residence in order to see her child and interview Singleton and Baltimore. (*Id.* ¶¶ 23-24.) Foster-Stith also directed Quinn-Mims to interview the child's biological father and instructed her to determine whether Baltimore had completed sexual offender treatment subsequent to the 1991 and 1992 indicated findings of abuse against him. (*Id.* ¶ 24.)

That same day at 12:15 p.m., Quinn-Mims met with Singleton at her apartment in Zion and advised her of the DCFS investigation concerning Baltimore. (*Id.* ¶ 25.) During that meeting, Quinn-Mims confirmed that Singleton lived with her son and Baltimore as well as his children from a previous marriage, K1, K2, and K3. (*Id.*) Following the meeting with Singleton, at 1:15 p.m., Quinn-Mims contacted Baltimore by telephone at his place of employment. (*Id.* ¶ 26.) Quinn-Mims identified herself as a DCFS Child Protection Investigator but Baltimore refused to speak with her because he said she sounded like a bill collector, asked her not to call him at his place of employment and hung up on her. (*Id.*)

Quinn-Mims avers that she tried to call him several more times but could not reach him. (*Id.*) Baltimore, however, stated at his deposition that Quinn-Mims called him back approximately five minutes later and asked him to come to the DCFS office on Green Bay Road in Waukegan. (Baltimore Dep., Dkt. #187-1, at 176.)

At 1:25 p.m., Quinn-Mims reported to Foster-Stith that she had interviewed Singleton but was not able to determine the whereabouts of the Baltimore children. (*Id.* ¶ 27.) Quinn-Mims contacted the Zion School District and determined that the children attended a Zion elementary

4

school. (*Id.* ¶ 28.) She found out that the older children routinely went from the school to the Firm Foundation Childcare Center across the street when school was over. (*Id.* ¶ 29.) At 1:50 p.m., Quinn-Mims interviewed K2 in the presence of the school social worker. (*Id.* ¶ 30.) K2 stated that she did not like living with her father (*Id.* ¶ 30) and responded no when asked if anyone had ever touched her "private parts" inappropriately. (Pl.'s Rule 56.1(b)(3) Resp., Dkt. # 182, ¶ 30.) She also stated that her father caused bruises to her biological mother. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 30.)

At 1:58 p.m., Foster-Stith spoke with manager Durpetti about the Baltimore investigation. (*Id.* ¶ 31.) Foster-Stith's notes indicate that she needed Quinn-Mims to find out if Baltimore had completed any sexual offender treatment services subsequent to the indicated sexual abuse findings against him. (*Id.*) Foster-Stith and Durpetti decided to try to work out a safety plan with the family "otherwise protective custody [was] to be taken of the minors." (Def.'s Ex. A-1, Dkt. # 178-1, Bates 132.) At approximately 2:05 p.m., Quinn-Mims told Foster-Stith that she had confirmed the whereabouts of some of the children at the school and Foster-Stith directed her to follow those children from school to the daycare center to see if the other younger children were there.[3] (*Id.* ¶ 32.)

At 2:20 p.m., Foster-Stith spoke to DCFS Child Protection Supervisor Amanda Catheline who informed Foster-Stith that prior DCFS reports on the biological mother were unfounded. (*Id.* ¶ 33.)

At 2:30 p.m., Quinn-Mims interviewed K1 who told her he did not like living with his father and that his father hit his biological mother and left bruises on her body. (*Id.* ¶ 34.) K1

---

[3] Quinn-Mims affidavit is slightly different and states that at 2:05 p.m., she told Foster-Stith that two of the children were at the elementary school and that the younger two were at the day care center across the street. The Court does not deem these to be material differences.

further stated that he had not been inappropriately touched. (Pl.'s Rule 56.1(b)(3) Resp., Dkt. # 182, ¶ 34.) A few minutes later, Foster-Stith spoke with the biological mother who stated that Baltimore had been arrested for domestic battery in August 2007 and that he had been in rehabilitation several times for a "crack habit." (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 35.)

At 2:50 p.m., Quinn-Mims told Foster-Stith that she had interviewed the Baltimore children and that although they did not report any abuse, they stated they did not want to live with their father. (*Id.* ¶ 36.) Foster-Stith contacted Baltimore at his place of employment at 2:59 p.m., told him there was a current investigation pending and that she needed to speak with him about his children. (*Id.* ¶ 37.) She told Baltimore that he had a prior indicated report of sexual abuse and he stated he recalled the report but that he had not participated in sexual offender treatment and would not be willing to go to treatment. (*Id.*) He agreed to meet Foster-Stith at the DCFS Waukegan office between 4:00 p.m. and 4:30 p.m. that day. (*Id.*) Baltimore contends that it was Quinn-Mims who called him, but points to no record evidence in support of this assertion. (Pl.'s Rule 56.1(b)(3) Resp., Dkt. # 182, ¶ 37.)

At or before 3:15 p.m., Quinn-Mims interviewed K1 and K2's teachers at their elementary school. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 38.) K2's teacher said she had concerns about K2 because she had had several urinary tract infections, a case of ringworm and had found K2 sitting in the bathroom. (*Id.*) Foster-Stith documented that Quinn-Mims advised her of what the teachers and social worker told her about K1 and K2. (*Id.* ¶ 39.)

At 3:42 p.m, Foster-Stith made a supervisory note that Quinn-Mims had interviewed the children and that they did not disclose any sexual abuse or inappropriate touching. (*Id.* ¶ 40.) Foster-Stith further noted that the daycare provider had told Quinn-Mims that Singleton was at the daycare center that morning and had disclosed that there was some verbal abuse at the house

6

and that she might be moving out. (Def.'s Ex. A-1, Dkt. # 178-1, Bates 144.)

At 4:02 p.m., Quinn-Mims interviewed K3 who told her he did not like living with his father and that Baltimore's frequent arguments with Singleton "petrified" him. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 41.) K3 further told Quinn-Mims that Baltimore hit K3's biological mother and that his father had hit him with a belt. (*Id.*) A few minutes later, at 4:09 p.m., Foster-Stith updated her manager, Durpetti, about the case and told him that Baltimore had agreed to come in to the DCFS office before 5:00 p.m. (*Id.* ¶ 42.) She also told him there was an option to place the children with their biological mother pending the investigation of Baltimore and discussed the options for Singleton's son if Singleton continued to refuse to move out of their house. (*Id.*)

At 4:10 p.m., Quinn-Mims met with Singleton's son at the day care center and he did not show any signs of abuse or neglect. (*Id.* ¶ 43.) At 4:30 p.m., Quinn-Mims interviewed K3's teacher at the daycare center. (*Id.* ¶ 44.) She told Quinn-Mims that K3 came to the center on two occasions with a black eye and bruises on his face and that the child, who was normally talkative, refused to tell her what had happened. (*Id.*) At 4:30 p.m., while Quinn-Mims was meeting with K3's teacher at the daycare center, Foster-Stith met with Baltimore at the DCFS offices in Waukegan. (*Id.* ¶ 45.) Tim Rossi, a DCFS employee, was also present during Foster-Stith's meeting with Baltimore. (*Id.*)

During the meeting, Baltimore and Foster-Stith signed a two-page safety plan which provided that the Baltimore children, K1, K2 and K3, would reside with their biological mother and that Baltimore would have no unsupervised contact with them until he was assessed to be of no risk to the children. (*Id.* ¶ 46.) The safety plan by its terms was limited in duration until March 11, 2009, pending reassessment. (*Id.*) Foster-Stith did not tell Baltimore that he had to

sign the safety plan and according to her, he did not object to signing the safety plan. (*Id.*)

While Baltimore was at the DCFS Waukegan office, Foster-Stith completed Child Abuse and Neglect Tracking System ("CANTS") investigation forms including an adult substance abuse screen and a domestic violence screen to further identify risk factors. (*Id.* ¶ 47.) She completed these screens through a question and answer dialogue with Baltimore. (*Id.*) The substance abuse screen revealed that in 1991, drug-related criminal charges were made against Baltimore and that from 1991-1993 he had used cocaine. (*Id.*) The domestic violence screen identified the existence of significant indicators of domestic violence based on Baltimore's criminal history of assault or damage to property and police involvement for domestic violence. (*Id.*)

During the March 4, 2009, meeting with Foster-Stith at the DCFS Waukegan office, Baltimore signed a Consent for Release of Information authorizing his attorney, Ronald Bell, to release information to the Department regarding "court documents, orders, etc." as well as "any related information pertaining to [the] case." (*Id.* ¶ 48.) Baltimore also signed an additional Consent for Release of Information for a sex offender assessment and recommendation. (*Id.*) Tim Rossi's signature also appears on both release forms. (*Id.*)

Baltimore testified at his deposition that attorney Ronald Bell was representing him on March 4, 2009, "would be representing me" "[i]n the situation with my children" and had an "ongoing agreement with Mr. Bell" to represent him. (Bell Dep., Dkt. # 187-1, at 164.)

When Quinn-Mims finished speaking with the teachers at the daycare center, she called Foster-Stith who told her that Baltimore had signed a safety plan in which he agreed that the Baltimore children would reside with their biological mother. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 50.) Foster-Stith authorized and directed Quinn-Mims to transport the children from the

8

daycare center to the DCFS Waukegan office where their biological mother would pick them up. (*Id.* ¶ 51.)

At 5:40 p.m., Quinn-Mims spoke with K1 at the DCFS Waukegan Office and K1 told her that he knew why Quinn-Mims was there that day to pick up the Baltimore children from school. (*Id.* ¶ 53.) K1 told Quinn-Mims that in January, Singleton told him that the children had to leave the home or his father would get into trouble because he could not be around any children. (*Id.*) K1 explained to Quinn-Mims that "his father did something sexual to his niece a long time ago." (*Id.*)

At 5:55 p.m., Foster-Stith met with Young, the biological mother of the Baltimore children, at the DCFS Waukegan office. (*Id.* ¶ 54.) She signed the March 4, 2009, two-page safety plan, which provided that the Baltimore children would reside with her and that Plaintiff would have no unsupervised contact with the children until he was assessed to be no risk to the children. (*Id.*) Foster-Stith explained to Young that a DCFS investigator from the Aurora DCFS office would be coming to her home weekly to monitor the safety plan while the children were with her. (*Id.* ¶ 54.) After Young signed the safety plan, Foster-Stith then released the Baltimore children to Young. (*Id.* ¶ 55).

Quinn-Mims did not have in-person contact with Baltimore on March 4, 2009, and did not meet with him at the DCFS Waukegan office on March 4, 2009. (*Id.* ¶ 57.) Baltimore contends he met with Quinn-Mims, but provides no record evidence in support. (Pl.'s Rule 56.1(b)(3) Resp., Dkt. # 182, ¶ 57.)

*Subsequent Investigation and Safety Plans*

On March 5, 2009, Bell called Quinn-Mims and identified himself as Baltimore's attorney. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 58.) Quinn-Mims explained to Bell the

9

purpose of the current DCFS investigation and further advised Bell to consult with Baltimore about his prior history. (*Id.*) Bell told Quinn-Mims that Baltimore never told him he had been indicated for molesting children. (*Id.*) Bell told Quinn-Mims he had advised Baltimore to cooperate with DCFS regarding the safety plan. (*Id.*)

On March 6, 2009, at 12:00 p.m., Quinn-Mims met with Roberta Vanorsby, the case manager for Aunt Martha's Youth Service Center, at the DCFS Waukegan office to discuss the Baltimore investigation and her role as Singleton's case manager. (*Id.* ¶ 59.) Vanorsby told Quinn-Mims that in January 2009, when she was looking into having Princess' residence approved as a placement, she received confirmation that Baltimore was an indicated sex offender. (*Id.*) Vanorsby then told Singleton about Baltimore's prior indicated findings of child sexual abuse. (*Id.* ¶ 60.)

That same day, Quinn-Mims met with Singleton and they signed a two-page safety plan dated March 6, 2009, for the period March 6, 2009 though March 13, 2009. (*Id.* ¶ 61.) Singleton agreed to the terms of the safety plan which provided that her son E would reside with his father, Eugene Johnson, and that E would not have contact with Baltimore or reside at his home. (*Id.*) Johnson, E's biological father, also signed the safety plan. (*Id.*) The terms of this safety plan provided that Roberta Vanorsby was responsible for monitoring the safety plan. (*Id.*)

On March 6, 2009, in accordance with the March 4, 2009, safety plan that he signed and agreed to, Baltimore began the sexual offender evaluation process with Gerald Blain, Licensed Clinical Professional Counselor. (*Id.* ¶ 62.) On March 11, 2011, Quinn-Mims called Gerald Blain to discuss the progress and status of Baltimore's sex offender assessment. (*Id.* ¶ 63.)

On March 12, 2009, Quinn-Mims consulted with Foster-Stith who in turn reviewed the safety plan with Manager Durpetti. (*Id.* ¶ 64.) Foster-Stith made a request to the DCFS Elgin-

Aurora office to monitor the safety plan for the Baltimore children while in the care of their biological mother, Young, to investigate and complete a background check on Young's paramour and to make community referrals for services available to Young. (*Id.*)

On March 12, 2009, at approximately 6:30 p.m., Quinn-Mims met with Baltimore and Singleton. (*Id.* ¶ 65.) Baltimore signed the second safety plan with Quinn-Mims for the period March 12, 2009 through March 19, 2009, providing that the Baltimore children would continue to reside with Young and that Baltimore would have no unsupervised contact with the children until he completed an assessment determining him to be of no risk. (*Id.*) Baltimore did not object to signing the safety plan. (*Id.*)

On March 19, 2009, Quinn-Mims met with Baltimore and he signed the third safety plan with Quinn-Mims for the period March 19, 2009 through March 27, 2009, providing that the Baltimore children would continue to reside with Young and that Baltimore would have no unsupervised contact with the children until he completed an assessment determining him to be of no risk. (*Id.* ¶ 66.) Baltimore did not object to signing the safety plan. (*Id.*)

On March 19, 2009, DCFS Child Protection worker Mo'Nique Boozer from the Aurora DCFS office met with Young and the Baltimore children at Young's home. (*Id.* ¶ 67.) The children reported to Boozer that they liked living with their mother and did not want to return to their father's care. (*Id.*) Boozer completed a Child Endangerment Risk Assessment Protocol safety determination form on the Baltimore children while they were living with their mother. (*Id.*)

On March 23, 2009, Child Protection Supervisor Amanda Catheline of the Aurora DCFS office updated and approved the safety plan for the Baltimore children while they resided in Aurora with Young. (*Id.* ¶ 68.)

11

On April 27, 2009, Quinn-Mims met with Baltimore and Singleton and he signed the fourth safety plan for the period April 24, 2009, through May 24, 2009, providing that the Baltimore children would continue to reside with Young and Baltimore would have no unsupervised contact with the children until he completed an assessment determining him to be of no risk. (*Id.* ¶ 69.) Baltimore did not object to signing the safety plan. (*Id.*)

On April 29, 2009, at the conclusion of the March 2009 investigation, DCFS indicated Baltimore for child abuse, Allegation of Harm #22a, "substantial risk of sexual injury." (*Id.* ¶ 70.) He did not appeal the indicated finding despite having received notice of his right to an appeal. (*Id.* ¶ 71.)

The final safety plan between Baltimore and DCFS ended on April 29, 2009. (*Id.* ¶ 72.) On May 21, 2009, the Circuit Court of the Sixteenth Judicial Circuit, Kane County, Illinois, Domestic Relations Division, entered an order denying Young's petition to modify the custody arrangement and ordering Young to return the Baltimore children to Baltimore. (*Id* ¶ 74.) Near the end of May 2009, Baltimore picked up the children from Young, did not allow them to finish the school year in Aurora, and subsequently returned them to Young less than two weeks later. (*Id.* ¶ 75.)

**II.     Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmoving party may not merely rest upon the allegations or details in his pleading, but

instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

Before addressing the merits of Baltimore's claims, the Court notes that Baltimore has failed to properly respond to many of the defendant's statements of material fact. For example, Baltimore denies numerous statements of fact but often fails to cite to any record support for the denial stating only that he "disagrees." In other instances, he denies certain statements of fact but cites only generally to various exhibits and attachments without identifying a specific page number.

Quinn-Mims moves to strike many of Baltimore's responses on the ground that he has failed to properly respond to them. Baltimore argues in his response to the motion to strike that the court should rely on his additional statement of facts and "[a]ssuming *arguendo* that it would have been more appropriate from a technical standpoint for Plaintiff to have cross-referenced his Rule 56.1(b)(#)(C) additional facts with his responses," that he should be allowed to submit such cross-references. As an initial matter, simply cross-referencing to one's statement of additional facts is not the proper way to respond to the movant's statements of fact. As the relevant local rule indicates, in response to the moving party's statement of facts, the non-moving party must submit "a concise response to the movant's statement" that shall contain "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon . . . ." Local Rule 56.1(b)(3)(B).

The local rule further provides that any of Baltimore's responses that disagree with the defendant's statements and are not properly supported are deemed admitted. *See* Local Rule 56.1(b)(3) ("All material facts set forth in the statement required of the moving party will be

13

deemed to be admitted unless controverted by the statement of the opposing party."). *See also U.S. v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("At summary judgment . . . saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it [is] not the district court's job to sift through the record and make [the party's] case for him."). The Court is permitted to require strict adherence to the local rules regarding summary judgment, *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006), and does so here. Any of the responses not properly supported by the record are deemed admitted.

### III. Analysis

#### A. Count I

##### 1. Fourth Amendment

Baltimore claims that his Fourth Amendment rights were violated when he was "held captive by Quinn-Mims, who informed him that if he did not sign a safety plan, he would never see his children again." (Pl.'s Resp., Dkt. # 201, at 6.) As an initial matter, the Court notes that the Seventh Circuit has stated in a similar case that when a couple's child was removed from their home by DCFS, the parents "were not seized; thus, their claims are properly analyzed under substantive due process." *Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011).

Nevertheless, it appears that Baltimore is alleging that he personally was seized in violation of the Fourth Amendment by Quinn-Mim when she purportedly was interviewing him. Although Baltimore attests in an affidavit submitted in support of his opposition to Quinn-Mims' summary judgment motion that he met with Quinn-Mims on March 4, 2009 at the DCFS office, no other evidence in the record supports this assertion. "Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Albiero v. City of*

14

*Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (citation and quotation marks omitted). All of the record evidence, including the detailed case notes created by Quinn-Mims and Foster-Stith (Def.'s Ex. A-1, A-2, Dkt ## 178-1, 178-2) and Tim Rossi's affidavit in which he attests that Foster-Stith interviewed Baltimore (Def.'s Ex. Q, Dkt. # 178-18), supports the defendant's position that Baltimore met with Foster-Stith, not Quinn-Mims, at the DCFS offices. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 45.) Baltimore points to no record evidence, other than his own affidavit, in support of his contention that he met with Quinn-Mims. Because Baltimore has failed to adequately support his contention that he was seized by Quinn-Mims, the Fourth Amendment claim fails.

Moreover, even assuming that Quinn-Mims was the person he met with at DCFS, a person is seized under the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* at 554. While Baltimore contends that he felt pressure by Quinn-Mims to sign the safety plan, there is no evidence that he was not free to leave. Baltimore has cited to no caselaw in support of his contention that the instant facts support a finding of an unreasonable seizure.

Accordingly, Quinn-Mim's motion for summary judgment on the Fourth Amendment claim is granted.

      2.     <u>Procedural Due Process</u>

Baltimore next claims that by obtaining his signature on the safety plan through duress, Quinn-Mims violated his procedural due process rights. He appears to be arguing that he should

have been granted an opportunity to be heard before his children were taken from him.  He claims that "[t]he issue is not the legality of safety plans, but the legality of obtaining a safety plan after the children had been taken by DCFS."  (Pl.'s Resp., Dkt. #201, at 7.)

But the facts as supported by the record show that Baltimore's signature on the safety plan *was* obtained prior to the children being taken by Quinn-Mims.  (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ ¶ 50-51.)  Again, Baltimore's assertion to the contrary is unavailing because it is completely unsupported and indeed contradicted by the record evidence.  Both Quinn-Mims and Foster Stith attest that Baltimore signed the safety plan prior to Quinn-Mims taking custody of the children (Def.'s Ex. C, ¶ 21; Def.'s Ex. D, ¶ 20), and the contact notes from DCFS detailing the March 4, 2009 investigation indicate that Baltimore signed the safety plan prior to the children being taken by DCFS (Def.'s Ex. A-2 at 44.)  The Seventh Circuit has stated that when "the safety plan is voluntary, no hearing of any kind is necessary; hearings are required for deprivations ordered over objection, not for steps authorized by consent."  *Dupuy v. Samuels*, 465 F.3d 757, 761-62 (7th Cir. 2006).

Moreover, Baltimore's contention that he was coerced into signing the safety plan because Quinn-Mims told him that he had to do it or he would never see his children again is meritless because the Court has already concluded that the record evidence demonstrates that Baltimore met with Foster-Stith, not Quinn-Mims, regarding the safety plan.  Because Quinn-Mims did not meet with Baltimore regarding the safety plan and had no role in having him sign the safety plan, she cannot be personally liable for depriving him of his procedural due process.  *DeMont v. Bebber*, No. 4:10–cv–04031–SLD–JAG, 2012 WL 1880618, at *2 (C.D. Ill. May 22, 2012) ("When making a § 1983 claim based on a violation of the Fourteenth Amendment's procedural or substantive due process components, the plaintiff must establish that the *individual*

intentionally or deliberately caused a deprivation of life, liberty, or property.") (emphasis added). In any event, as noted below, Baltimore's assertion of coercion is not supported by the evidence.

### 3. Substantive Due Process

Baltimore also claims that Quinn-Mims violated his substantive due process rights. "Substantive due process considers whether an individual has been subjected to the arbitrary exercise of government power, irrespective of the procedures that were followed." *Piekosz-Murphy v. Bd. of Educ. of Cmty. High Sch. Dist. No. 230*, --- F.Supp.2d ----, 2012 WL 851554, at *3 (N.D. Ill. Mar. 12, 2012). As with the procedural due process claim, Baltimore must show that Quinn-Mims intentionally deprived him of his liberty interest in the care, custody and management of his children. *DeMont,* 2012 WL 1880618, at *2. "The Due Process Clause protects citizens from abuses of power by executive officials . . . but official misconduct will rise to the level of a constitutional violation only if it shocks the conscience." *Palka v. Shelton*, 623 F.3d 447, 453-54 (7th Cir. 2010).

According to Baltimore, Quinn-Mims violated his substantive due process rights when she took custody of his children before a safety plan had been signed. But the Court has already concluded that the record establishes that Baltimore signed the safety plan on March 4, 2009, prior to Quinn-Mims taking the children.

Baltimore also argues that Quinn-Mims deprived him of his substantive due process rights because she told him that he had no choice but to sign the safety plans and could not legally challenge her taking his children. As to the safety plan signed on March 4, 2009, the Court has already concluded that the record evidence establishes that Foster-Stith, and not Quinn-Mims, spoke to Baltimore that day. As to the other safety plans, Baltimore's assertion is belied by the record evidence. Each of the safety plans that Baltimore signed states that "I/we

17

have discussed the safety plan with the investigator/worker, we understand its contents and that it is voluntary, and agree to abide by the terms and conditions of the plan." (Def.'s Ex. B, Dkt. # 178-3.) Moreover, Baltimore testified that Bell was acting as his attorney both on March 4, 2009, and in the "situation with his children." (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 48; Bell Dep., Dkt. # 187-1, at 164.)

Indeed, Baltimore admitted that on March 5, 2009, before he signed any of the latter three safety plans, Bell called Quinn-Mims, identified himself as Baltimore's attorney, spoke with her about Baltimore's history, and stated to her that he had advised Baltimore to cooperate with DCFS regarding the safety plan. (Def.'s Rule 56.1(a) Stmt., Dkt. # 176, ¶ 58.) Thus, Baltimore's assertion that he signed four safety plans under duress and ignorant of his rights is contradicted by the statements of his own attorney to Quinn-Mims. Moreover, Baltimore's actions in signing the safety plans are consistent with what his own attorney advised him to do–cooperate. His present assertions of coercion and ignorance of his rights are contradicted both by the statements of his attorney and his own actions at the time. His self-serving affidavit, which is contradicted by actions and statements at the time of the events at issue, is insufficient to establish a genuine issue of material fact.

Baltimore's citation to *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), as "synonymous" with the instant case is inapposite. In that case, the court concluded that the plaintiff, who as a child was forcibly removed from his parent's home by two men who did not identify themselves to the parents based on allegedly false allegations of child neglect, had stated a claim for a substantive due process violation. Not only are the facts not on point, but that case was at the pleading stage, not summary judgment, when the plaintiff must support his claims with evidence.

**B**.     **Count IV--False Light**

Baltimore also alleges a false light claim against Quinn-Mims.  Specifically, Baltimore claims that Quinn-Mims' actions in investigating him led her to publicize false information about him to various school and day care personnel and his own children.

"To prove a claim for false light invasion of privacy, the plaintiff must show (1) the defendant's actions placed the plaintiff in a false light before the public; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false."  *Sandefur v. Vill. of Hanover Park*, No. 10 C 5851, 2012 WL 2062594, at *8 (N.D. Ill. Jun. 7, 2012) (citation and internal quotation marks omitted).

Quinn-Mims is immune from suit as a public official.  "The doctrine of public official immunity rests on the principle that a government official should be protected from personal liability for making discretionary judgments based on his perception of public needs."  *Falk v. Martel*, 569 N.E.2d 248, 251 (Ill. App. Ct. 1991).  Quinn-Mims' actions in interviewing the Baltimore children and their daycare workers and teachers was a discretionary act performed as part of her job as a DCFS investigator and were within the scope of her duties.  Therefore, she is shielded from liability under the doctrine of public official immunity.

Even assuming that Quinn-Mims was not immune from liability, Baltimore fails to point to any evidence supporting a claim that she acted with actual malice or with reckless disregard for whether the statements were true or false. Baltimore contends that the "incomplete investigation and subsequent subterfuge regarding the signing of the safety plan . . . underscores reckless disregard by Quinn-Mims."  (Pl.'s Resp., Dkt. # 201, at 16.)  He goes on to argue that although Quinn-Mims considered the 1991 and 1992 findings of indicated abuse, she did not

19

consider the subsequent finding of not guilty in criminal court. But Baltimore points to no authority stating that DCFS can only investigate possible child abuse if a criminal conviction of the purported abuser has been obtained. Moreover, his reference to the purported subterfuge regarding the safety plan is, as discussed above, unsupported by the record.

Accordingly, the Court grants Quinn-Mims' motion for summary judgment with respect to the false light claim.

**IV. Conclusion**

For the reasons stated below, Quinn-Mims' motion for summary judgment as to Counts I and IV [148-1 and 172-1] is granted. Baltimore's motion to voluntarily dismiss Count II, the conspiracy claim, is also granted. All other pending motions are denied as moot. This order resolves all claims against all parties (Dkt. ## 95 and 113.) Accordingly, the clerk is directed to enter a Rule 58 judgment and terminate this case from the Court's docket.

**Date:** August 20, 2012

_____
**Ronald A. Guzman**
**Unite States District Judge**